1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BNSF RAILWAY COMPANY,

Plaintiff,

v.

ALAMEDA COUNTY, et al.,

Defendants.

Case No. 19-cv-07230-HSG

**ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 35

Pending before the Court is Plaintiff BNSF Railway Company's ("BNSF") motion for a preliminary injunction (Dkt. No. 35 ("Mot.")), for which briefing is complete. Dkt. Nos. 43 ("SD Opp."), 44 ("Counties' Opp."), 53 ("Reply"). BNSF requests a preliminary injunction against fifteen counties ("Defendants," or "Defendant Counties") under 49 U.S.C. § 11501(b)(3), which prohibits applying higher tax rates to railroad property. On March 12, 2020, the Court held a hearing on the motion. Dkt. No. 58. The Court **GRANTS** the motion for preliminary injunction.

**I.    BACKGROUND**

**A.    The 4-R Act**

The 4-R Act (now codified at 49 U.S.C. § 11501 ("Section 11501")) was passed in 1976 to "restore the financial stability of the railway system." *Burlington N. R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 457 (1987). This was, in part, because railroads "are easy prey for State and local tax assessors," as they are "nonvoting, often nonresident, targets for local taxation" that cannot easily remove themselves from the locality. *W. Air Lines, Inc. v. Board of Equalization of State of S.D.*, 480 U.S. 123, 131 (1987). Congress declared that state and local taxation schemes that discriminate against rail carriers "unreasonably burden and discriminate against interstate commerce." 49 U.S.C. § 11501(b). As relevant here, Section 11501(b)(3) bans discriminatory tax

1    rates, and provides that state and local governments may not "levy or collect an ad valorem tax on

2    rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and

3    industrial property in the same assessment jurisdiction." *Id.*

4              **B.     California Property Taxation**

5              California's system of taxation is, in a word, complicated. California law imposes an ad

6    valorem (*i.e.*, value-based) property tax on all property in the State, unless exempt, in proportion

7    to its assessed value. Cal. Const. Art. XIII, § 1. Taxation is a three-step process. First, the value

8    of taxable property is assessed. Next, the applicable tax rate is computed, typically expressed as a

9    percentage of assessed value. Finally, the tax is levied and collected from the taxpayer.

10             Most property in California, including general "commercial and industrial property," is

11   "locally assessed," meaning that county assessors determine the assessed value of the property for

12   tax purposes. *See* Declaration of Alan M. Annis, Dkt. No. 35-1, ("Annis Decl.") ¶ 7. California

13   classifies and taxes the bulk of property in the state as either "secured" or "unsecured." *See id.* ¶

14   8. The "secured roll" consists of most state-assessed property and that portion of locally assessed

15   property for which the taxes are secured by a lien on real property of a value sufficient to pay the

16   taxes. *See* Cal. Rev. & Tax. Code § 109. The "unsecured roll" consists of all other property, such

17   as personal property and possessory interests in tax-exempt land. *Id.*

18             Every year, each Defendant County's board of supervisors determines the tax rates to be

19   applied in the county for locally assessed property and for unitary property, applying different

20   statutory formulas. Cal. Rev. & Tax. Code § 2151. Defendants' respective auditors apply these

21   applicable tax rates to the assessed value shown on the assessment rolls. Cal. Rev. & Tax. Code §

22   2152. Then, Defendants' respective tax collectors collect the taxes on unitary property at the

23   unitary rate determined by each county. Cal. Rev. & Tax. Code §§ 2605, 2610.5. Locally

24   assessed property, including commercial and industrial property, is assigned to a particular "Tax

25   Rate Area" within each county, based on the property's location. *See* Annis Decl. ¶ 11.

26             For property on the secured tax roll, the annual ad valorem tax rate for each Tax Rate Area

27   is established as (a) a 1% general tax levy, typically used to fund general government services,

28   plus (b) an amount necessary to produce sufficient revenues to pay the interest and principal on

2

1    any voter-approved bonded indebtedness issued by the county or by the local agencies, school

2    entities, and special districts serving that Tax Rate Area. Cal. Rev. & Tax. Code § 93 ("Section

3    93"), enacted per Cal. Const. Art. XIIIA, § 1 ("Proposition 13"). This latter portion of the Section

4    93 tax rate above the 1% base levy is known as the "debt service component." Under Proposition

5    13, real property must be valued at its 1975 fair market value (as shown on the 1975-76

6    assessment roll), or thereafter, the fair market value when purchased, newly constructed, or a

7    change of ownership has occurred after the 1975 assessment (i.e., the occurrence of an "assessable

8    event"). Cal. Const., art. XIII, § 2(a).

9         The debt service component is the sum of separately calculated rates for each local agency,

10   school entity or special district with outstanding debt. To calculate the elements of the debt

11   service component, the County first determines how much revenue it will need to make debt

12   service payments for the upcoming year for the voter-approved debt of the local agency, school

13   entity, or special district. *See* Cal. Gov. Code § 29100. Next, the County determines the portion

14   of assessed property values on the secured roll subject to the voter-approved debt issued by the

15   local agency, school entity or special district (i.e., the property located within the boundaries of

16   each local entity). *Id.* The County then calculates the percentage of those total property values

17   that will produce the necessary revenues to service the debt issued by that local entity, after

18   allowances for delinquencies and annual changes to the roll, among other factors. *Id.* The debt

19   service component in each Tax Rate Area is the sum of these calculated percentages for every

20   local agency, school entity or special district serving that Tax Rate Area. The debt service

21   component is combined with the 1% base levy to compute the total property tax rate in each Tax

22   Rate Area for property on the secured roll.

23        The property tax rate for property on the unsecured roll is the secured roll tax rate for that

24   Tax Rate Area for the previous year. Cal. Rev. & Tax. Code § 2905. This rule is consistent with

25   the separate requirement that unsecured taxes are due each year before the County calculates the

26   secured tax rate for that year. *See* Cal. Rev. & Tax. Code § 2922.

27        In contrast, the State Board assesses the value of certain utility and railroad property

28   (including Plaintiff's property). Cal. Rev. & Tax. Code § 721. The State Board assesses

3

1   Plaintiff's property using the principle of unit valuation, under which all of a taxpayer's assets,

2   wherever located, are valued as a unit, and that unitary value is then allocated among particular

3   taxing jurisdictions. *See* Annis Decl. ¶ 6. State-assessed property that is valued under the

4   principle of unit valuation is also referred to as "unitary property." *See* Cal. Rev. & Tax. Code §§

5   723, 723.1. Unit taxation provides a way to value and tax property in businesses for which the

6   component parts of the business are valuable when considered as a whole, but worth less when

7   considered in isolation. *See ITT World Commc'ns, Inc. v. City & Cnty. of S.F.*, 37 Cal. 3d 859,

8   863 (Cal. 1985). For example, "ten miles of [railroad] track . . . 'would have a questionable value,

9   other than as scrap, without the benefit of the rest of the system as a whole.'" *Am. Airlines, Inc. v.*

10  *Cnty. of San Mateo*, 12 Cal. 4th 1110, 1126 (Cal. 1996) (internal citations and brackets omitted).

11          **C.      Taxation Applicable to Railways**

12          Plaintiff's primary argument is that the tax rate applicable to its property is calculated

13  under a different formula than the Section 93 tax rate for locally-assessed commercial and

14  industrial property, resulting in a tax rate higher than the Section 93 tax rate. According to

15  Plaintiff, first, under Cal. Rev & Tax. Code § 100.11, the value attributable to the state-assessed

16  unitary property of a regulated railway company is generally allocated to a single countywide Tax

17  Rate Area in each county in which the property is located. The "unitary" tax rate to be applied to

18  these countywide tax rate areas is established in accordance with the formula in Cal. Rev. & Tax.

19  Code § 100(b)(2) ("Section 100"). Cal. Rev. & Tax. Code § 100.11(a)(2)(B).

20          Section 100 (like Section 93) includes the base 1% tax levy. However, the additional

21  unitary debt service component under Section 100 is calculated by taking the County's previous

22  year's unitary debt service rate and multiplying it by the percentage change between the two

23  preceding fiscal years in the County's ad valorem debt service levy for the secured roll (excluding

24  unitary and operating nonunitary debt service levies). *See* Mot. at 8. Plaintiff contends that this

25  formula has caused the Section 100 unitary tax rate to diverge from the Section 93 secured and

26  unsecured tax rates. In particular, when a County's debt service needs increase, the secured and

27  unsecured rates will not rise if property values also rise and keep pace with inflation. But under

28  those same circumstances, the Section 100 unitary debt service rate will increase because it

4

depends on the absolute dollar amount of debt service.

The State Board calculates and publishes the annual "average rate of general property taxation" in each California county. Annis Decl. ¶¶ 24–26, 32. The State Board computes this average tax rate by dividing (a) the sum of the total ad valorem property tax levies in each county for each year, by (b) the total assessed value of all property in that county for that same year. *See* Cal. Rev. & Tax. Code § 11403. For the 2019-20 tax year, using the methods described above, Plaintiff contends that the Defendant Counties have levied property taxes at the unitary rate applicable in their respective assessment jurisdictions. Below are the alleged differences between the unitary rate applied to Plaintiff's property and the Section 11501 "benchmark rate":

| County | 2019-20 Plaintiff Unitary Rate | 2019-20 Section 11501 Benchmark Rate |
|---|---|---|
| Alameda | 2.5187% | 1.241% |
| Contra Costa | 1.6865% | 1.148% |
| Fresno | 1.370408% | 1.181% |
| Kern | 1.611299% | 1.24% |
| Kings | 1.326084% | 1.087% |
| Madera | 1.203169% | 1.089% |
| Merced | 1.4109014% | 1.088% |
| Orange | 1.28173% | 1.064% |
| Plumas | 1.11652% | 1.089% |
| Riverside | 1.76133% | 1.164% |
| San Bernardino | 1.3645% | 1.144% |
| San Diego | 1.62331% | 1.142% |
| San Joaquin | 1.6922% | 1.145% |
| Stanislaus | 1.38011% | 1.103% |
| Tulare | 1.4002% | 1.113% |

*See* Annis Decl. ¶33.[1]

---

[1] The average rate difference for the Defendant Counties for the 2019-2020 fiscal year is only 0.38%, while the median difference is 0.29%. Differences in prior years are generally even smaller. *See* Narciso Decl., ¶ 10 & Ex. 7. With these smaller differences, Defendants are correct that it is all the more important for Plaintiff to meet its burden of demonstrating that it has identified the tax rate applicable to the proper comparison class. However, most Defendants admit in their Answer (ECF No. 52 ¶ 34)—and San Diego states that it lacks sufficient information to

## II.  LEGAL STANDARD

The prohibition on tax rate discrimination is enforceable through an action for equitable relief in federal court.  In enacting Section 11501, "Congress … believed that a federal court remedy for carriers subject to discriminatory taxation was necessary because state courts were not providing them with a plain, speedy, and efficient remedy." *Trailer Train Co. v. State Bd. Of Equalization*, 697 F.2d 860, 866 (9th Cir. 1983).  Congress thus included in Section 11501 "a procedural component which authorizes victims of discrimination to seek injunctive relief in federal court." *Id*.  This provision specifically empowers federal courts to "grant such mandatory or prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate any acts in violation of [Section 11501]," notwithstanding 28 U.S.C. § 1341.  *Id*. at 869 & n.16; *see* 49 U.S.C. § 11501(c).

Plaintiff contends that a preliminary injunction under Section 11501 is not governed by the traditional equitable criteria of likelihood of success, irreparable harm, balance of hardships, or public interest.  *See* Mot. at 5 (citing *Trailer Train*, 697 F.2d at 869).  Instead, because Section 11501 specifically contemplates interim equitable relief, a preliminary injunction must issue "[w]here the trial court finds reasonable cause to believe that a violation of Section [11501] has been, or is about to be, committed." *Burlington N. R. Co. v. Dep't. of Revenue of State of Wash.*, 934 F.2d 1064, 1074 (9th Cir. 1991); *BNSF Ry. v. Tenn. Dep't of Revenue*, 800 F.3d 262, 268 (6th Cir. 2015) ("[A] railroad seeking injunctive relief under the 4-R Act need only demonstrate that there is 'reasonable cause' to believe a violation of the 4-R Act has occurred or is about to occur.").

Defendants disagree, and contend that the Court should instead apply the traditional equitable criteria.  Defendants believe that the Ninth Circuit's decisions in *Burlington* and *Trailer Train* (as well as other circuit court decisions) misapplied—or failed to apply—the Supreme Court's decision in *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), and instead incorrectly applied the Tenth Circuit's standard in *Atchison, T. & S.F. Railway Co. v. Lennen*, 640 F.2d 255,

state (ECF No. 51 ¶ 10)—that the tax rates set forth in the chart are the tax rates levied on Plaintiff by the Defendant Counties, and the 2019-2020 tax rates the State Board calculates pursuant to Section 11403 of the Revenue and Taxation Code.

1    259-61 (10th Cir. 1981), the first instance in which the "reasonable cause" standard was applied to

2    an alleged 4-R Act violation.

3        Notwithstanding any arguments Defendants may wish to preserve for potential *en banc*

4    consideration on appeal, the Ninth Circuit has clearly decided this question. *See Burlington N.*,

5    934 F.2d at 1074 ("Issuance of preliminary injunctive relief in Section [11501] cases is not

6    governed by the traditional equitable criteria applicable in actions between private litigants . . . .");

7    *Trailer Train*, 697 F.2d at 869 ("The standard requirements for equitable relief need not be

8    satisfied when an injunction is sought to prevent the violation of a federal statute which

9    specifically provides for injunctive relief. . . . Section [11501] clearly falls within this exception

10   because its subsection (c) specifically authorizes a district court to grant injunctive relief to

11   prevent a violation of the statute."). This Court is bound to apply that clear holding unless the

12   "circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher

13   authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). The Court finds that no

14   intervening authority permits it to disregard the "reasonable cause" standard set out by the Ninth

15   Circuit in *Burlington* and *Trailer Train*.[2] Accordingly, the Court applies that standard, and will

16   issue a preliminary injunction if there is reasonable cause to believe that a violation of the 4-R Act

17   has occurred, is occurring, or will occur.

18   **III.    ANALYSIS**

19       **A.    Commercial and Industrial Property**

20       The plain language of Section 11501(b)(3) prohibits levying "an ad valorem property tax

21   on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and

22   industrial property in the same assessment jurisdiction." Section 11501(a)(2) defines "assessment

23   jurisdiction" as "a geographical area in a State used in determining the assessed value of property

24   for ad valorem taxation." Section 11501(b)(3) recognizes that "tax-rate variation" is improper

25

26   _____

27   [2] Defendants assert that *Trailer Train* neither cites nor acknowledges the Supreme Court's ruling
     in *Romero-Barcelo*, presumably (according to Defendants) because *Trailer Train* was argued and
     submitted on March 10, 1982, while *Romero-Barcelo* was not decided until April 27, 1982. *See*
28   Counties' Opp. at 10 n. 3. However, *Trailer Train* was decided by the Ninth Circuit on January
     25, 1983, more than seven months after *Romero-Barcelo*.

7

1  taxation of railroad property. *Trailer Train*, 697 F.2d at 865–66. The relevant section states:

2          (b) The following acts unreasonably burden and discriminate against
           interstate commerce, and a State, subdivision of a State, or authority
3          acting for a State or subdivision of a State may not do any of them: *
           * * (3) Levy or collect an ad valorem property tax on rail
4          transportation property at a tax rate that exceeds the tax rate
           applicable to **commercial and industrial property** in the same
5          **assessment jurisdiction**.

6  49 U.S.C. § 11501 (emphasis added). Defendants, as counties of California, are legal subdivisions

7  of the State of California, (Cal. Const. Art. XI, § 1), and thus are subject to Section 11501(b)(3).

8  And Plaintiff's unitary property in California is "rail transportation property" within the meaning

9  of Section 11501(b)(3) and is, therefore, entitled to the protection of the statute. *See* Declaration

10  of Judy A. Cummings, Dkt. No. 35-2 ¶ 4.

11          The disputed element of Section 11501(b)(3) is the comparison to "the tax rate applicable

12  to commercial and industrial property." *See* Mot. at 2. In order to prove a violation of Section

13  11501(b)(3), Plaintiff must demonstrate that Defendants are levying or collecting an ad valorem

14  property tax at a rate that exceeds the rate applicable to commercial and industrial property located

15  in the same assessment jurisdiction as Plaintiff's property. 49 U.S.C. § 11501(b)(3).

16          The Ninth Circuit established the framework for that comparison in *Trailer Train*.

17  Plaintiffs there sued to enjoin the collection of a state tax on private railroad cars because the

18  applicable tax rate was higher than the rate for commercial and industrial property under the then-

19  adopted Proposition 13, such that the private railroad car tax "discriminated against owners of rail-

20  transportation property" in violation of Section 11501(b)(3). 697 F.2d at 864. After recognizing

21  the purpose of Section 11501 and affirming the district court's authority to enjoin violations of the

22  statute, the Ninth Circuit turned to comparing the challenged tax rate to "the rate generally

23  applicable to commercial and industrial property." *Id*. at 866-67.

24          The Ninth Circuit explained that this "task is complicated by the fact that," due to

25  California's unique classification system (dividing property into secured and unsecured, as

26  opposed to residential and commercial/industrial), "California has no specific tax rate for

27  commercial and industrial property." *Id*. at 867. Because neither Section 11501, "nor its

28  legislative history provides guidance as to what should be done when a specific rate generally

8

1   applicable to commercial and industrial property is not readily apparent," the Ninth Circuit

2   articulated a framework with two alternative approaches for identifying "the tax rate generally

3   applicable to commercial and industrial properties" specifically in California, and specifically

4   under Section 11501. *Id*.

5           The first approach in that framework is to determine "the tax rate applicable" to whichever

6   tax roll, either secured or unsecured, contains "the majority of [the] commercial and industrial

7   property." *Id*. Determining which tax roll contains the majority of commercial and industrial

8   property is (often) straightforward. The secured roll in each county contains the vast majority

9   (consistently over 90%) of the assessed value and the taxes levied against all property in that

10  county, and the secured roll, according to Plaintiff, almost certainly contains the majority of

11  commercial and industrial property. *See* Annis Decl. ¶¶ 30–31.

12          However, the weakness of this approach is that "the tax rate applicable" to the property on

13  the secured roll cannot be determined. Plaintiff contends that the property on the secured roll is

14  spread among the hundreds or thousands of Tax Rate Areas in each Defendant County that each

15  have their own tax rates. *See id.* ¶¶ 15, 31. Thus, Plaintiff contends that there is no identifiable

16  "tax rate applicable" to property on the secured or unsecured roll of any of the Counties.

17          As a fallback, the Ninth Circuit in *Trailer Train* authorized a second approach. First, the

18  Court is to determine the average tax rate for all property in the relevant county. *See Trailer*

19  *Train*, 697 F.2d at 868 n.13 ("We thus, for reasons different from those articulated by the district

20  court, conclude that the average rate for all property should be used when the rate generally

21  applicable to commercial and industrial property cannot be determined.").

22          Plaintiff alleges that identifying the "average rate for all property" is possible because the

23  State Board already calculates that rate—the annual "average tax rate of general property taxation"

24  in each county. *See* Annis Decl. ¶ 24. By statute, the State Board calculates this average tax rate

25  by dividing (a) the sum of all ad valorem property tax levies in a given county for a given year by

26  (b) the sum of the assessed values of all property in that county for that same year. Cal. Rev. &

27  Tax. Code § 11403. According to Plaintiff, the State Board-calculated rate for each county is the

28  maximum rate the Defendants can apply to railroad property, meaning that taxing railroad

9

1    property at rates that are higher than the Section 11501 "Benchmark Rate" is a violation of Section

2    11501(b)(3).[3]

3        Defendants counter that the relevant assessment jurisdiction is the area of the entire State

4    of California that contains the unitary property, and the tax rate applied to the railroad must be

5    compared to the tax rate applied to other commercial and industrial property that is assessed as

6    unitary property.  Counties' Opp. at 19.  Defendants further contend that, under Article XIII,

7    Section 19 of the California Constitution, the assessment jurisdiction of the State includes the

8    following types of property: "(1) pipelines, flumes, canals, ditches, and aqueducts lying within 2

9    or more counties and (2) property, except franchises, owned or used by regulated railway,

10   telegraph, or telephone companies, car companies operating on railways in the State, and

11   companies transmitting or selling gas or electricity." *Id*. at 20.

12       Defendants, in theory, are contending that Section 100 (applicable to Plaintiff) does not

13   differentiate in the way tax rates are applied among these commercial and industrial properties,

14   because these nonrailroad companies do not have a different rate than Plaintiff.  Put differently, all

15   of the non-railroad commercial and industrial property that is assessed as "unitary property" for

16   purposes of local property taxation is taxed pursuant to Section 100.

17       The Court finds Defendants' suggestion that it should compare Plaintiff's tax rate to the

18   rates for a relatively narrow subset of other state-assessed utilities and other entities that pay the

19   same unitary tax rate inconsistent with the 4-R Act.  Section 11501(b)(3) calls for a broader

20   comparison to the rate paid by "*commercial and industrial property* in the same assessment

21   jurisdiction," where an "assessment jurisdiction" is "a geographical area *in a State*."  49 U.S.C.

22   11501(a)(2) (emphasis added).  The "commercial and industrial property in" the "geographical

23   area" of California clearly is not limited to state-assessed utilities or similar Section 19 property: it

24   embraces all commercial and industrial taxpayers in the state.  For the same reasons that there are

25   not county-specific rates for commercial and industrial taxpayers in California, (Mot. 9-10, 14-15),

26   there are also no statewide rates.

27   _____

28   [3] Plaintiff contends they will pay, for the 2019-20 tax year, a total of more than $3.2 million in taxes prohibited by Section 11501.  *See* Annis Decl. ¶ 35.

1    Railroads, like other utilities such as pipelines and telecommunications companies, are

2  "easy prey" in that they are "nonvoting, often nonresident" targets "who cannot easily remove

3  themselves from the locality." *Western Air Lines, Inc. v. Board of Equal.*, 480 U.S. 123, 131

4  (1987) (quotation marks omitted).  The solution, Congress recognized early on, was to link

5  railroads' fate with a mass of other taxpayers by insisting that "[rail] carriers are accorded equal

6  tax treatment with other taxpayers."  S. Rep. No. 87-445 at 466 (1961).  Significantly, before the

7  final version of Section 11501 was passed, a provision permitting comparisons solely against

8  public utilities was introduced and rejected.  *See Atchison, Topeka & Santa Fe Ry. Co. v. Ariz.*,

9  559 F. Supp. 1237, 1244 (D. Ariz. 1983) (citing S. Rep. No. 92-1085 (1972)).  The upshot is that

10  the comparison the Defendant Counties propose—between railroads and other state-assessed

11  taxpayers subject to the same tax laws—does not comport with the statute Congress enacted.

12    Defendants appear to recognize that *Trailer Train* poses a challenge for their argument.

13  They contend that the taxes at issue here are calculated at the local level and do not require use of

14  a statewide general property tax rate, whereas *Trailer Train* involved the applicability of the 4-R

15  Act to a statewide tax on plaintiffs' private railroad cars, and the effort to identify a comparison

16  class for that statewide tax.  697 F.2d at 862.

17    But that is a distinction without a difference.  The challenge in *Trailer Train*, as here, was

18  determining which group of commercial and industrial property to use as a comparison class,

19  given that commercial and industrial property appeared on both the secured and unsecured rolls.

20  The Ninth Circuit held first that "[t]he tax rate applicable to the roll that contained the majority of

21  the commercial and industrial property shall be deemed the rate generally applicable to

22  commercial and industrial property and will serve as the base rate for comparison against the

23  Companies' $10.68 rate."  *Id*. at 867.  The Ninth Circuit further reasoned that "[i]f the

24  determination of which roll contained the majority of the state's commercial and industrial

25  property in the 1978-79 fiscal year is not possible, the average tax rate for all property shall be

26  used as the basis for comparison."  *Id*.

27    Defendants characterize *Trailer Train* as hinging on its discussion of a uniform statewide

28  tax versus local taxation of unitary property.  But this ignores the Ninth Circuit's recognition that

11

1   there is no specific commercial and industrial rate for locally assessed property in California.

2   Defendants contention that *Trailer Train* predates the legislation subjecting railroad property to

3   unitary rates is irrelevant to the key question that *Trailer Train* resolves—how to determine the

4   appropriate comparison rate for locally-assessed property—and California law on that point

5   remains unchanged.

6           The Court finds that Defendants' proposed comparison is untethered from the statutory

7   language and unsupported by Section 11501 jurisprudence.  Indeed, under the Defendants'

8   approach—under which railroads are only compared to taxpayers that are taxed like railroads—

9   violations of Section 11501(b)(3) likely would be rare or nonexistent, and Congress would have

10  accomplished very little.  The statute's use of the term "assessment jurisdiction" demonstrates that

11  Congress was concerned with the basic principle that like property should be treated alike.

12  Because there is no specific commercial and industrial rate in the State of California, *Trailer Train*

13  authorized the use of either the rate for the secured roll or the average rate for all property.

14          Accordingly, under the *Trailer Train* framework, Plaintiff has established reasonable cause

15  that a violation of Section 11501(b)(3) has occurred or will occur if it is required to pay taxes at

16  the rate Defendants claim applies for the 2019-20 tax year.

17          **B.      Discrimination and Justification**

18          Defendants make a secondary argument that Plaintiff (and the railroad industry) lobbied to

19  be taxed at the Section 100(b) rate that Plaintiff now alleges is unlawful.  According to

20  Defendants, the railroad industry wanted its taxes to be calculated under Section 100(b) because

21  the railroads wanted to "reduce[ ] the administrative burden imposed on the Board of Equalization,

22  county auditors and treasurers, and the railroads."  *See* Declaration of Michael Narciso, Dkt. No.

23  44-4 Ex. 5 at pages 316-17 (ECF pagination).

24          Defendants cite to the railroad industry's arguments in favor of the current law, specifically

25  the claim that "each year, the railroads, the State Board of Equalization (SBE) and individual

26  taxing jurisdictions must undertake a painstaking and time consuming process in which they are

27  forced to redraw hundreds of 'tax maps' and prepare a similar number of bills for each and every

28  tax rate area where there are railroad tracks. . . .  This year, for instance, Union Pacific Railroad

12

1    and BNSF Railway Company received more than 2,400 tax rate area changes and 2,850 operating

2    tax bills from the tax districts." *Id.* Defendants point out that this legislation, by allowing the

3    railroad to pay only on one tax rate area in each county, reduced the number of operating tax bills

4    from 2,850 to approximately 61. *Id.*

5          Defendants thus argue that any discriminatory outcome for Plaintiff was a direct result of

6    the railroad industry's lobbying efforts regarding which tax rates would apply to its members in

7    California. Defendants use the legislative history to argue that Plaintiff should not be allowed to

8    reap the benefits of its lobbying efforts, then pounce only once it perceives an advantage in

9    invoking Section 11501. Defendants contend that Section 11501 is meant to address concerns

10   about the railroads' political vulnerability and establishes a prohibition only as to *discriminatory*

11   state taxation of railroad property. Thus, Defendants conclude, because the railroads in California

12   wanted to be taxed pursuant to Section 100(b), and wanted to benefit themselves through reduced

13   administrative burdens provides, this provides sufficient justification for any alleged tax disparity.

14         Whatever equitable force Defendants' argument might have in a vacuum, the Court finds it

15   to be inconsistent with the relevant language in the statute. Section 11501(b)(3) does not use the

16   word "discriminates." Rather, subsection (b)(3) forbids "[l]evy[ing] or collect[ing] an ad valorem

17   property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to

18   commercial and industrial property in the same assessment jurisdiction." 49 U.S.C. §

19   11501(b)(3). The statute does not require proof of discrimination, because Congress has already

20   declared in the preface of Section 11501(b) that the imposition of such an ad valorem property tax

21   rate disparity "unreasonably burden[s] and discriminate[s] against interstate commerce." 49

22   U.S.C. § 11501(b).

23         In arguing to the contrary, Defendants cite the Supreme Court's 2011 decision in *CSX*

24   *Transportation, Inc. v. Alabama Department of Revenue*, 562 U.S. 277 (2011) ("*CSX I*"), which

25   discussed the meaning of the word "discriminate" in Section 11501 and explained how a state

26   might engage in illegal discrimination under Section 11501(b)(4). The Court stated that if a state

27   charged "one group of taxpayers a 2% rate and another group a 4% rate," the State would be

28   discriminating against the latter group, "assuming the groups are similarly situated and there is no

13

1    justification for the difference in treatment." *CSX I*, 562 U.S. at 287.

2           Four years later, the Court found such justification for a difference in treatment in *Alabama*

3    *Department of Revenue v. CSX Transp., Inc.* ("*CSX II*"), 575 U.S. 21 (2015). At issue there was

4    whether the 4-R Act prohibited Alabama from imposing a 4% tax on the diesel fuel used by

5    railroads that it did not impose on the diesel fuel used by the railroads' competitors, given that

6    Alabama also imposed comparable taxes on the competitors that it did not impose on railroads.

7    *Id*. at 24, 30. The Court concluded that the 4-R Act did not prohibit such differential treatment

8    because "an alternative, roughly equivalent tax is one possible justification that renders a tax

9    disparity nondiscriminatory." *Id*. at 30-31.

10          The Court finds the *CSX* cases inapplicable. In both *CSX I* and *CSX II*, Section

11   11501(b)(3) was not at issue: the Court addressed Section (b)(4), which specifically prohibits a

12   state from imposition "another tax that *discriminates* against a rail carrier …." *See* Section

13   11501(b)(4) (emphasis added). In *CSX I*, the "key question" was "whether a tax might be said to

14   'discriminate' against a railroad under subsection (b)(4)." 562 U.S. at 286. The Court held that

15   subsection (b)(4) permits a justification defense because, as used in that subsection, the undefined

16   term "discriminates" means a failure to treat similarly situated taxpayers the same without

17   "justification for the difference in treatment." *Id*. at 287. Then, in *CSX II*, the Court held that the

18   existence of an "alternative, roughly equivalent tax" (paid by the taxpayers to which the railroad is

19   compared) is a possible justification under subsection (b)(4). 575 U.S. at 30-31. These

20   discussions about when the catchall provision regarding "another tax that discriminates" might be

21   triggered do not shed light on the issue presented in this case, because the face of the statute

22   already reflects Congress' determination that the acts set out in subsection (b)(3) amount to *per se*

23   discrimination against interstate commerce.

24   **IV.    CONCLUSION**

25          Because Plaintiff has established reasonable cause that a violation of Section 11501(b)(3)

26   has occurred or will occur, the motion for a preliminary injunction is **GRANTED.**

27          Defendants Alameda County, Contra Costa County, Fresno County, Kern County, Kings

28   County, Madera County, Merced County, Orange County, Plumas County, Riverside County, San

14

1  Bernardino County, San Diego County, San Joaquin County, Stanislaus County, and Tulare

2  County, California; their boards of supervisors, county auditors, tax collectors, agents, employees,

3  and all those acting in concert or participating with them who receive actual notice of this order

4  (the "Enjoined Parties") are hereby **ENJOINED** through the pendency of this litigation until entry

5  of a final judgment from levying or collecting ad valorem property taxes from Plaintiff on its

6  unitary property based on a tax rate higher than the annual average tax rate of general property

7  taxation calculated and reported for each county by the California State Board of Equalization

8  under Cal. Rev. & Tax Code §11403.

9        The Enjoined Parties are further enjoined through the pendency of this litigation until entry

10  of a final judgment from taking any action to impose any interest or penalties, from taking any

11  action to record or enforce a tax lien upon any property used or owned by Plaintiff, or from taking

12  any other action authorized by state law for delinquent or unpaid taxes under California law.

13        Plaintiff will be required to post a bond under Federal Rule of Civil Procedure 65(c).  The

14  parties are directed to meet and confer and agree if possible by 5:00 p.m. Pacific Time on April 9,

15  2020 regarding the appropriate amount of the bond.  *See* Opp. at 25 (seeking bond of "no less than

16  $1.6 million in lost tax revenue"), Reply at 15 (acknowledging that Plaintiff will post a bond if

17  ordered, without indicating its view as to the appropriate amount of the bond).  By that time, the

18  parties should either file an agreed-upon proposed bond order (which should be done if at all

19  possible), or separate proposed forms of order (understanding that the Court is going to require a

20  bond notwithstanding Plaintiff's argument that doing so is unnecessary).

21        Consistent with the discussion at the hearing, *see* Dkt. No. 61 at 41, the parties are also

22  directed to meet and confer and submit a joint proposal by April 15, 2020 regarding the proposed

23  timing of initial disclosures, discovery and other proceedings in light of this order.

24

25        **IT IS SO ORDERED.**

26  Dated:   4/8/2020

27  

28          HAYWOOD S. GILLIAM, JR.
        United States District Judge

15